UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA                    CASE NUMBER: 8:12-CR-45-T-35-AEP

-v-

SAMI OSMAKAC,

     Defendant.

_____/

**MOTION REQUESTING DISCLOSURE
OF FISA INTERCEPTIONS
AND ANCILLARY CIPA RESTRICTIONS
IN SUPPORT OF EVIDENCE TO BE PRESENTED
BY DEFENDANT OF ENTRAPMENT**

COMES NOW the Defendant, SAMI OSMAKAC, by and through his undersigned attorney, pursuant to Title 50, United States Code, Section 1801 *et seq.*, as amended by FISA Amendments Act of December 31, 2012; and Title 18, United States Code, Appendix III, Sections 1-16, and respectfully requests this Honorable Court to enter appropriate orders herein, and as grounds thereof alleges as follows:

**I.  ADOPTION OF FACTUAL RENDITION**

1.     A filed Motion (Dkt#96) for Disclosure of *Brady, Giglio,* Federal Rule of Criminal Procedure 16 and Jencks Material enumerates a number of facts and is already part of the filings in this matter.  For purposes of record economy reference is made to those facts in this motion and as such are hereby adopted.

1

2.    The petition here is predicated, as noted above, on the Foreign Intelligence Surveillance Act (FISA), as amended, and the Classified Information Procedures Act (CIPA).

## II.  DOCUMENTARY SECRECY SAMPLING

3.    Five documents, among thousands, are perhaps probative in this inquiry. They are but a sampling of others that likewise have the same or similar information on them. One set of documents has a declassification stamp and a code, IT051DADAGM. It also has the earlier date of declassification, December 28, 2011. Others have different declassification dates. Another set of documents enjoyed a "SECRET" stamp for some time. Some provided still have the "SECRET" stamp. A third type of document, a surveillance log coversheet, refers to a case number of "CT-GLOBAL EXTREMIST INSPIRED." The document also in its appropriate location notes a secret classification. An FD-1055 includes the time of the allowed surveillance in ninety (90) day segments of authorization. Another document refers to a FISUR number.

## III.  NATURE OF INVESTIGATION

4.    It can be drawn from the stamps, entries and documents within the discovery material that the case contains once classified information. There appear to have been petitions and extensions for interception and surveillance. The matter did not start out as a criminal inquiry. It referred to global issues and thus it is obvious that there is far more than meets the eye.

5.    Given the fact that OSMAKAC became a United States citizen, and the date is critical, certain restrictions to FISA may apply. Also there is no connection

2

between  OSMAKAC, foreign intelligence and foreign terror groups.  Albeit there are aspirational suggestions on the massive record there is no underlying support for any of it.  On the contrary there are ample communications confirming failure in any effort to join an illusory "jihad" here or abroad.

6.    Again it is important to reflect upon the early entry of the "source" that appears out of nowhere on November 5, 2010.  The process had been ongoing.  And the process eventually included multiple offices, hundreds of agents, thousands of miles of travel and presumably, many informational interceptions, electronic and direct.

## IV.  GENERAL ENTRAPMENT PREDICATES

7.    In the context of terrorism there seems to be a mix of vigilance, a concern for national security, a great deal of secrecy and the usual natural prejudices that can lead individuals, including respected and seasoned members of law enforcement, to believe a threat exists when it really does not. Sometimes regardless of whether or not an informant's conduct supports a claim of  entrapment the existence of any real threat in the underlying case to the security of the nation is questionable. Where the existence of the actual threat is speculative and much needs to be supplied to the perpetrator it is appropriate to question the efficacy and feasibility of how informants investigate suspected terrorists.  Further the informant's ability to discern true criminality seems subordinated to other, less altruistic concerns, such as benefits promised, moneys and favorable treatment.

8.    The American people are anything but apathetic towards the threat of terror.   For years the color assigned the level of threat was a morning staple of most homes.

The first explanation in the media and the minds of most for any catastrophe, such as a bridge collapse, power grid failure, subway event and similar accidents, was terror. And the usual suspects would be someone connected to Middle Eastern extremists or Islamic jihadists. Studies suggest that there is widespread support for, or tolerance of, racial profiling when it involves Arab and Muslim Americans in the national security context. Accordingly, certain investigative tactics have gained consistent acceptance due to this public support. For example, the Federal Bureau of Investigation has used infiltrator informants to monitor the activities within mosques around the country. In many cases, there is a real question about whether a target would have broken the law but for the informant's prodding, promotion and insistence. It is troublesome and even dangerous to allow an individual untrained in law enforcement techniques to target other individuals of an already highly suspect minority. It is equally dangerous to allow the same individuals to pass judgment on the levels of radicalization, the potential for reversibility or absence thereof, as the CHS did in this OSMAKAC case without any level of advanced expertise in the field of psychology. And frankly much of this interdiction effort does nothing to avoid actual violent activity. In many investigations the violent activity was nonexistent to begin with or could not be developed but for the encouragement, inducements, and provision of everything necessary to bring the crime to fruition by the government agents.

9. The standard to determine the applicability of the entrapment defense is the subjective test. *Jacobson v. United States*, 503 U.S. 540 (1992) (reaffirming the *Sorrells-Sherman* approach). The determination hinges on whether the criminal

design originates with the government and then government agents implant in the mind of an innocent person the disposition to commit a crime and induce its commission in order to breed a crime the government may prosecute. *Sorrells v. United States*, 287 U.S. 435, 444 (1932). To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. *Sherman v. United States*, 356 U.S. 369, 372 (1958). The focus is on the defendant's propensity to commit the crime. *United States v. Russell*, 411 U.S. 423, 440 (1973). Where the government has induced an individual to break the law and the defense of entrapment is at issue, as it was in this case, the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by government agents. *Jacobson*, 503 U.S. at 548-49 (citing *United States v. Whoie*, 925 F.2d 1481, 1483-84 (1991)).

10. In *Jacobson v. United States*, *supra*, the Court confronted the case of a fifty-six (56) year old former veteran and farmer convicted of child pornography. *Id.* at 542. The defendant Keith Jacobson, ordered magazines of nude males from a California adult bookstore. *Id.* The young men photographed in the magazines were preteen and teenage boys, but not engaged in any sexual activity. *Id.* at 542-43. Under both federal and Nebraska law, where Mr. Jacobson lived, no crime was committed upon the February 1984 receipt of the magazines. *Id.* at 543. However, just three short months later, postal inspectors found Mr. Jacobson's name on the mailing list of the California bookstore that supplied the adult magazines. *Id.* That same month a new provision safeguarding children from

pornography became law making Mr. Jacobson's previous legal action, illegal. *Id.*

11.    The government seized the opportunity and launched a lengthy investigation, spanning two and a half (2.5) years. *Id.* Over this period, the government made repeated efforts through a series of inquiries and solicitations including the use of five fictitious organizations and a bogus pen pal to explore Mr. Jacobson's sexual proclivities. *Id.* In March 1987 the government finally enticed Mr. Jacobson to order a publication which featured preteen males because, as Jacobson recounted at trial, over time the government had succeeded in piquing his curiosity. *Id.* at 547. A search warrant followed, he was arrested, brought to trial and convicted of knowingly receiving through the mails sexually explicit material depicting a minor. *Id.* at 547-48.

12.    In overturning the Eight Circuit's affirmation that "Jacobson was not entrapped as a matter of law," the Supreme Court endorsed Jacobson's entrapment defense. *Id.* at 548, 551-54. In doing so the Court pointed out that Jacobson grabbed the government's attention when he **legally** purchased the later illegal magazines. *Id.* at 551-52 (emphasis added). The sole piece of pre-investigation evidence was the legal purchase in 1984 and this evidence was "scant" proof of Jacobson's predisposition to commit an illegal act. *Id.* at 550. The Court instructed the Defendant's predisposition was to be evaluated prior to being approached by the Government. *Id.* at 553.

13.    The practical implementation, how to prove or disprove predisposition, is not specifically outlined by the Court nor are there bright line rules. Rather the

6

predisposition inquiry requires prediction and speculation as to what a particular defendant would have done had the government not intervened.   A valiant attempt to continue the logical development of predisposition came with the decision in *United States v. Hollingsworth*, 9 F.3d 593 (7th Cir. 1993), *aff'd en banc*, 27 F.3d 1196 (7th Cir. 1994).

14.    *Hollingsworth* was a 1990 money laundering case involving complex facts resulting in a "positional predisposition" event.   27 F.3d at 1200.   That predisposition is not merely the willingness to commit the crime but the ability to do so with the help of the government.   *Id.* at 1200.   The rationale behind the *Hollingsworth* reversal in thought is rooted in a belief that a person who is likely to commit a particular type of crime without being induced by government agents, although he would not have committed it when he did but for that inducement, is a menace to society and a proper target of law enforcement.   *Id.* at 1203.   It follows that the government creates a serious risk of inducing crime when it also provides the means for individuals to carry out crimes that they otherwise would not have been able to commit.   The defense of entrapment reflects the view that the proper use of criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character.   *Id.*

### V.  THE CLIMATE OF TERROR AND THE IMPACT ON THESE PROCEEDINGS

15.    In the context of terrorism, a defendant's religious and political views may be used as the foundation of the predisposition blurring of the line between First

Amendment rights and ideologies that amount to threats worthy of attention. Terrorism involves a particularly reprehensible offense to society as a whole, to most, the worst misconduct of all.  Yet the true story of terror is largely shielded and unknown.  In order to predict the future we need to review the past.

16.  There are four countries officially designated as state sponsors of terror.  These are Iran, Sudan, Syria and Cuba. *U.S. Department of State,  Under Secretary for Civilian Security, Democracy, and Human Rights, Bureau of Counterterrorism, Terrorist Designations and State Sponsors of Terrorism, State Sponsors of Terrorism*, http://www.state.gov/j/ct/list/c14151.htm (Last visited Feb. 14, 2013). The association of four has garnered significant attention.  Interestingly three of the four countries are populated by brown skinned, largely Muslim people.  Yet the threat to the  security of the United States from Cuba has been palpable, significant and the dangerous dating back to 1960.  No other nation has insisted on a nuclear first strike by missiles within its territory against the continental United States.   Fidel Castro demanded that Nikita Khrushchev do so during the Cuban missile crisis. No other country has exported revolution and terror throughout the world for half a century. Cuba has done so. No other nation wrote the book on asymmetrical warfare, dispensed the information and trained its users. Cuba has done so.  No other country has successfully penetrated an asset to the level reached by Ana Belen Montes, indicted in 2001 after ten years of espionage at the Defense Intelligence Agency, as Cuba has done.   Montes prepared and offered daily security briefings on hemispherical dangers to the Pentagon and the White House, in her secret capacity as an active operational

8

Cuban agent.  No one had ever penetrated the workings of our government as she did.  Her activities were directed by the Directorate of Intelligence (DI) of the Republic of Cuba.  Despite Cuba brokering the information to actual terrorist groups, not the talkers of trash but the doers of deeds, the penetration patterns and the FISA events against Cuban intelligence are embarrassingly scarce.   As we speak there is a growing danger as a result of the physical presence of Iranian intelligence officials directly involved with the interception of our most secure transmissions, including CENTCOM, within a listening station in Cuba.  One (1) agent is working the Iranian interception case, one hundred twenty-two (122) at last count worked OSMAKAC.

## VI.  THE TILT IN THE PLAYING FIELD

17.   A disturbing number of the American people suspect Barack Obama was born in Kenya and is in fact a Muslim. Against this backdrop we have law enforcement guidelines.

18.   Recent guidelines on FBI domestic operations permit the agency to open "assessments," meaning potentially probing surveillance and investigations on a target, without any particular structural predicates. The techniques that the FBI uses in conducting those assessments have not been disclosed to the public despite the efforts that have sought them. The FBI's use of informants is ostensibly governed by the Attorney General's Guidelines on Federal Bureau of Investigation Undercover Operations (Guidelines).  These regulations are generally followed by other federal agencies, as well as some state and local law

9

enforcement.  Many members of other agencies beyond the FBI, including state officers, participated in OSMAKAC. The guidelines have a subsection on entrapment which includes language that tracks a subjective test. There are series of preconditions that must be met before an undercover operation can be authorized and the focus of these conditions is on the critical elements of a target's predisposition or lack thereof.

19.   There have been many recent incidents documented where the FBI has attempted to convince citizens and even noncitizens, including Muslim religious leaders, not simply mosque members, to become informants. When individuals have refused the invitation the agency has increased the pressure by addressing the legal status of those that are not naturalized. In the wake of the first World Trade Center bombing of February 1993 it came to light that the FBI had been using an informant, a former Egyptian army officer who had managed to penetrate the original conspiracy. The agency claimed to have dropped the informant after his refusal to wear a recorder. The case agents did not "drop" him.  but rehired him after the attack. In OSMAKAC the CHS likewise refused to record for the first sixty-five (65) days of contact. At trial defense lawyers argued that their clients had been entrapped by a clever provocateur. Despite the defendants' assault on his character the government obtained convictions in a traditional prosecution.

20.   Everything changed after 9/11. The government's efforts to engage in preventive prosecution of terrorists began.   The objective is intended to derail any dangerous plot before such plot comes to fruition. Preventive prosecution contrast with terrorist prosecutions prior to 9/11 which brought on punishment in

10

the traditional sense.   Preventive prosecutions are prudent and well founded unless they go too far and ensnare the vulnerable that happen to be innocent.

21.   As of January 2010, there had been three hundred and thirty-seven (337) federal terrorism prosecutions of different types.  The number of cases had leveled off to a  yearly average of thirty (30) from a high of one hundred and twenty-seven (127) indicted in the year immediately following 9/11.  Slightly over one percent (1%) of defendants have been acquitted at trial or by a judge.  *See Terrorist Trial Report Card, The Center on Law and Security*, New York University School of Law, January 2010.

22.   In *United States vs. Siraj*, 468 F. Supp. 2d 408 (E.D.N.Y. 2007), *aff'd*, 533 F.3d 99 (2d Cir. 2008), the Court addressed a 2003 plot to blow up a subway station in New York City.  Critical witnesses were a co-conspirator cooperating with the government; an undercover police officer; a confidential informant; and, the informant's handler.   *Id.* at 415.  In defense Siraj's alleged entrapment was based on the confidential  informant's repeated efforts to engage him in carrying out the bombing plot. *Id.* at 414.  Recall, entrapment requires an initial showing of inducement by the government.  *Id.* Once induced, the government has the burden to prove beyond a reasonable doubt the defendant was predisposed prior to the inducement.  *Id.*  At trial Siraj testified that the confidential informant, Osama Eldawoody, talked about the war in Iraq, the Abu Ghraib scandal, and the American government's treatment of Muslims to inflame his passions.  But the court allowed the testimony of the undercover police officer to rebut these arguments.  He testified that Siraj discussed the same issues before meeting

11

Eldawoody. *Id.* at 415. In rebuttal to Siraj's claim of inducement, the undercover officer testified about Siraj's praise of Osama bin Laden and support for further bombings in the United States. *Id.* at 419. Further the jury saw the admission of evidence of Siraj's support for Al Qaeda, Hamas, violence against Jews, and books and videos and with song and praise for so called violent jihad, which bolstered the government's predisposition argument. *Id.* at 422-23. The evidence of predisposition was established through the testimony of the cooperating witness; the confidential informant; recordings of defendant's statements; and, testimony of the undercover officer. *Id.* at 416.

23. In ruling on Siraj's motion for new trial, the Court held the undercover officer's testimony was admissible to rebut Siraj's claim he was a nonviolent person; to rebut he was induced by the confidential informant; and, to prove predisposition. *Id.* at 419. The government introduced recorded conversations of Siraj discussing his intent to blow up the 34th Street subway station; his idea to bomb bridges and attack military bases; and, his support of violence against Jews. *Id.* at 423. All of this testimony was admissible to rebut Siraj's testimony he was a non violent person. *Id.* The government used a co-conspirator and cooperating witness to testify that prior to meeting the confidential informant, Siraj recommended a book entitled *The New World Order* and the book was admitted to show Siraj's state of mind before meeting the confidential informant. *Id.* Siraj also recommended a book entitled *Jihad* which was also admitted to rebut the contention that the confidential informant introduced him to violent jihad. *Id.* Lastly, Siraj gave the undercover officer a video entitled *Illuminazi 9/11*, also

admitted to disprove the contention that the confidential informant induced him. *Id.* Finally, the undercover officer testified to conversations pre-dating the meeting with the confidential informant in which Siraj made statements supporting terrorist activities, and those statements were properly admitted as rebuttal evidence of inducement by showing that Siraj discussed the subjects he claimed he learned from the confidential informant before he actually met the confidential informant. An FBI 302 of May13, 2011, indicates that an FBI agent posing as a member of the Tampa Police Department investigating a battery interviewed OSMAKAC and OSMAKAC disavowed violence or terrorism on April 29, 2011, five months before meeting the CHS. *Id.*

24.    In *United States v. Hayat*, 2007 WL 1454280 *1 (E.D. Cal. May 17, 2007) a large part of the government's case was built on the testimony of an informant who befriended Hayat and frequently suggested and discussed politically and religiously charged topics. *Id.* At trial the informant was permitted to divulge all the contents of his conversation about extremist groups with Hayat. *Id.* at *13-16. Both the informant and the FBI agents were permitted to testify as to interactions with Hayat even without corroboration and despite the obvious motive and incentive to illicit self-incriminating statements from him. *Id.* at *23 n.16 (detailing the defenses' closing argument and emphasis on unrecorded conversations testified about at trial). The Government introduced the Arabic supplication found in Hayat's wallet through an expert witness. *Id.* at *17. The witness testified as to its significance and opined the prayer proved the mental

state necessary to commit the charged crimes despite the controversial and disputed nature. *Id.*  A second expert witness was used to speak generally of jihadi camps in Pakistan and their reputation for weapons training because it was alleged Hayat attended a terrorist training camp and then denied he ever did. *Id.*

25.    In *United States v. Lakhani*, 480 F.3d 171 (3rd Cir. 2007), the government engaged a professional informant who had earned about four hundred thousand dollars ($400,000) over nineteen (19) years in this capacity to approach Lakhani about purchasing missiles. *Id.* at 174.  The government had even previously stopped using the informant deeming him untrustworthy but he was permitted to testify and the jury found him credible enough to convict Lakhani. *Id.*  The government recorded hundreds of phone conversations and several face-to-face meetings between Lakhani and the informant from January 2002 through August 2003. *Id.* at 175 n.3.  These records made up much of the evidence against Lakhani at trial. *Id.* Although the recordings did not began until early 2002, the informant was permitted to testify regarding his first encounter with Lakhani, taking place shortly after the September 11, 2001, attacks and prior to the informant notifying the FBI of Lakhani's desire to do business with the informant. *Id.* at 175.  In denying Lakhani's motion to dismiss, the District Court pointed to the following evidence: Lakhani himself initiated the contact with the government informant on the advice of terrorists; he promoted himself during the very first contact with the informant as someone in the weapons business whose source and supply was in the Ukraine and had information and details about all types of weapons; on his own he made innumerable phone calls and made numerous trips

14

pursuing the deal with the informant; he was part of the world of arms trading before he contacted the informant; his efforts in the Ukraine, which amounted to unlawful brokering; and, Lakhani's own words and deeds as exposed on video. *Id.* at 181-82.

26.    In *United States v. Duka*, 671 F.3d 329 (3rd Cir. 2011), five young Muslim residents of New Jersey, three Albanian brothers included, were convicted of conspiring to attack the Army base at Fort Dix. *Id.* at 333. The investigation was triggered externally by an employee at Circuit City reporting to law enforcement that he had seen a videotape with footage of the defendants firing weapons in the woods while shouting in Arabic. *Id.* at 333-34. The government introduced an informant to investigate the matter. *Id*. at 334. The issue in the case was whether the defendants actually intended to attack the base or merely spoke about it. *Id.* at 347-48. The prosecution was allowed to introduce evidence showing that the defendants had repeatedly watched Al Qaeda videos, downloaded lectures and spoke in favor of Islamist violence, in addition to firing weapons in the woods. *Id.* at 333-34, 352-53 (affirming the District Court ruling). One video dated from January 2006 depicted the defendants at a firing range in the Pocono Mountains, shooting weapons and shouting "Allah Akbar!" and "jihad in the States!" *Id.* at 333-34. The FBI became involved after the video was made and on May 7, 2007, the FBI arranged a controlled event inside the informant's apartment. *Id.* at 335. The entire event was captured on tape by equipment installed by the FBI and shown to the jury. *Id.* With respect to the individual defendants, evidence was

produced highlighting their nationality; religious ideologies; beliefs; and, political affiliations. *Id.* at 334.

27. Alternative sources have detailed that one defendant became so suspicious of the informant's requests that he contacted the police to warn them. Another defendant told the informant that jihad would have to wait because he had to get a haircut. The informant countered that the defendants' boasts were big to start but later evaporated. Apparently the informant was a bank fraud convict and had served time in prison. He had previously escaped to Canada. Only after he was caught did he agree to help. He was also paid two hundred and forty thousand ($240,000.00) plus rent and expenses and given relief from his legal troubles. Another informant used agreed to work in that capacity after the threat of deportation from the United States. In what the government characterizes as a successful preventive prosecution, the defendants were apprehended before they even came close to carrying out the subject of their discussions. More importantly the defendant's argument that they were entrapped was offset by extrinsic evidence of their religious beliefs and political positions rendering the possibility of a more serious predisposition analysis fruitless.

28. In *United States v. Sami Al-Arian*, 267 F.Supp. 1258 (M.D. Fla. 2003), the Honorable James Moody was confronted with speedy trial issues. However a discussion developed related to FISA recordings that were indeed provided in discovery by the government, after declassification. A significant number remained classified. The opinion suggests the government was considering the filing of a motion for protective order. *Id.* at 1260. In the case the existence and

number of calls surfaced. Such is the level of threshold information that OSMAKAC seeks, existence, sources, numbers and time periods.

29. Not far to the south in the city of Miami in May 2009 five of seven defendants in the Seas of David prosecution were convicted. *United States v. Augustin*, 661 F.3d 1105, 1110 (11th Cir. 2011). The government alleged that the men were members of a radical Islamic group which sought Al Qaeda's help in arranging to blow up the Sears Tower in Chicago and the FBI building in Miami. *Id.* The informants heard from the group that they needed expensive equipment and $50,000 in cash but no explosives, something quite surprising for an alleged conspiracy to blow up large buildings. *Id.* at 1112. Despite other unique aspects of the case, the FBI deputy director calling the plan "more aspirational than operational" and the informants being paid more than $120,000 and given political asylum in the United States, there were convictions.

30. Clearly the cases support the proposition that irrespective of the outcome, latitude was given by the courts to explore support for the claims of entrapment even when the *probata* did not rise to the level of jury instruction entitlements.

## VII. DIMINISHED CAPACITY IN SUPPORT OF ENTRAPMENT

31. In *Matthews v. United States*, 485 U.S. 58 (1988), it was set forth that an entrapment defense consists of the government's inducement of a crime and lack of predisposition on the part of the defendant to engage in the criminal conduct. *Id*. at 63. The *Matthews* opinion, citing to *United States v. Russell*, 411 U.S. 423 (1973), further explained that predisposition is "the principal element in the

defense of entrapment," and in making such a determination, a court should ask the question was the defendant an "unwary innocent" or an "unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Id.*

32.   The Ninth Circuit in *United States v, Bonanno*, 852 F.2d 434 (9th Cir. 1988) set forth five factors to consider when determining a defendant's lack of predisposition: the defendant's character or reputation; whether the government made the initial suggestion of criminal activity; whether the defendant engaged in the activity for profit; whether the defendant showed any reluctance; and, the nature of the government's inducement. *Id*. at 438.

18

33.    In *Sorrells v. United States*, 287 U.S. 435 (1932), the opinion cited to the words of Circuit Judge Woods in *Newman v. United States* (C.C.A.) 299 F. 128, 131 (4th Cir. 1924), in explaining that a defendant should not be lured in to the commission of a crime.  Judge Woods stated as follows:

> "When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor." *Id*. at 445.

34.    In *U.S. v. Jones*, 231 F.3d 508 (9th Cir. 2000), the Ninth Circuit, citing to *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir.1994), provided that the restrictions are not limited to law enforcement officers but also apply to a person whom the "government authorizes, directs and supervises." *Id.* at 517.

35.    In *U.S. v. Ortiz*, 804 F.2d 1161 (5th Cir. 1986), the Court cited to *United States v. Reyes*, 645 F.2d 285, 287 (5th Cir.1981) ; *United States v. Boone*, 543 F.2d 412, 414 (D.C.Cir.1976); *United States v. Anglada*, 524 F.2d 296, 298 (2d Cir.1975), in establishing that the defense must demonstrate an evidentiary foundation to warrant an entrapment instruction.  *Id*. at 1165.  In the *Ortiz* case, the defendant neither testified nor presented any evidence to support an entrapment defense.  *Id*.  However, the *Ortiz* court ruled that a defendant may still be entitled to an entrapment instruction if sufficient evidence of entrapment, when viewing the evidence in the light

19

most favorable to the accused, is established through the testimony of the government's witnesses. *Id*.

36.   The issue of diminished capacity as part of an entrapment defense has been raised in several jurisdictions. One of the earliest opinions was from the Third Circuit in *United States v. Hill*, 655 F.2d 512 (3rd Cir.1981), The *Hill* court ruled that:

> "Testimony by an expert concerning a defendant's susceptibility to influence may be relevant to an entrapment defense. *United States v. Benveniste*, 564 F.2d 335, 339 (9th Cir.1977). An expert's opinion, based on observation, psychological profiles, intelligence tests, and other assorted data, may aid the jury in its determination of the crucial issues of inducement and predisposition.... A jury may not be able to properly evaluate the effect of appellant's subnormal intelligence and psychological characteristics on the existence of inducement or predisposition without the considered opinion of an expert.
> Accordingly, if the expert can reach a conclusion, based on an adequate factual foundation, that the appellant, because of his alleged subnormal intelligence and psychological profile, is more susceptible and easily influenced by the urgings and inducements of other persons, such testimony must be admitted as relevant to the issues of inducement and predisposition." *Id*. at 655.

37.   The matter was later addressed in *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984). In that opinion the Sixth Circuit stated that expert testimony regarding the predisposition of the defendant was relevant but ultimately excluded the testimony as a result of a Rule 12.2(b) violation as the defendant failed to give timely notice of the expert's testimony. *Id*. at 1114-15.

20

38.   The issue was raised in *U.S. v. Newman*, 849 F.2d 156 (5th Cir. 1988). The *Newman* court explained that the defense was a matter of first impression for that circuit. *Id*. at 165. The *Newman* court ruled that:

> "when an entrapment defense is raised, expert psychiatric testimony is admissible to demonstrate that a mental disease, defect or subnormal intelligence makes a defendant peculiarly susceptible to inducement. The expert must demonstrate a proper factual foundation for his testimony either through personal interviews with or psychological testing of the defendant. Fed.R.Evid. 703; *Hill*, 655 F.2d at 516. The expert may not offer an opinion on the ultimate issues of whether the defendant was in fact induced to commit the crime or lacked predisposition. Fed.R.Evid. 704(b); *United States v. Lueben*, 812 F.2d 179, 184 (5th Cir.1987). However, **he may testify that the defendant's mental disease, defect or subnormal intelligence made him more susceptible than the usual person to persuasion by government agents or rendered him incapable of forming the specific state of mind required for the offense**." *Id*. (emphasis added).

39.   One of the more recent cases was *U.S. v. McMahan*, 129 Fed.App. 924 (6th Cir. 2005). In the *McMahon* case the defendant claimed the defense of entrapment with diminished capacity. *Id*. at 930. However, the district court refused to give the entrapment instruction to the jury. *Id*. The *McMahan* court explained that a defendant has the burden of presenting evidence in support of both elements of the defense in order for the instruction to be given. In *McMahan* the defendant's argument in support of the jury instruction was that he suffered diminished capacity which elevated his susceptibility to the government's inducement. *Id*. The trial court held that:

21

"at the time of this offense, the defendant did not have a significantly reduced mental capacity because he did not have a significantly impaired ability to understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason." *Id.*

The Sixth Circuit found that ruling to be convincing and upheld the lower court's ruling not to give the entrapment instruction to the jury. *Id.*

40.    Radicalization assessments have surfaced in this prosecution.  A source report dated November 17, 2011, reveals that the source reported the following to his handlers:

> "OSMAKAC appears to be 'desperate.' **His radicalization is increasing every day and it does not appear he can be 'fixed' (deprogrammed of his radicalization)."** (emphasis added).

This raises the interesting discoverable question about the CHS's training, expertise and general psychological assessment capabilities.  Equally, the standards and regulations used by the CHS are part and parcel of the FBI's information in this case.

## VIII.  THE BASIS OF REQUEST

41.    Competency has sufficiently become an issue so as to prompt activity by the parties in that regard. Given the sealed nature of that process at this point counsel refrains from actual references, report cites, opinion inclusions or such other material. Counsel simply submits that diminished capacity is an issue. As such the entire period of time during which OSMAKAC was a target of interest, prior to November 1, 2010, is relevant for discovery.  OSMAKAC became or had already become the

22

subject of inquiry in his entry into Detroit, Michigan, McNamara Terminal of Detroit Metropolitan Airport, aboard Delta flight 243 from Istanbul, Turkey, via Amsterdam, Netherlands, on March 24, 2011, with the derivative extensive interviews and seizure of material and documents. Amsterdam inspectors notified DHS inspectors of their concerns.

42.    If OSMAKAC was more vulnerable to the suggestions of an informant because of the informant's encouragement and inducement and his own state of mind, the defense is entitled to know all the specifics to support the position. Information that the government has predating November 1, 2010, is critical so that it can either be used in the presentation of the defense case or so it can be developed as possible impeachment against impeachment on the issue of predisposition. Given the history of the prosecutions cited in this memorandum, one thing that does appear to have been looked upon favorably by the courts has been disclosure of information about payment histories, records, and the background of the informants or cooperators involved.

43.    The Department of Justice (DOJ) Guidelines Regarding the Use of Confidential Informants, published on January 8, 2001, and the Department of Justice Guidelines Regarding the Use of FBI Confidential Human Sources, published on December 13, 2006, define certain classes of  informants. One is a confidential informant or CI. Two, a cooperating defendant or witness. Three, a source of information. Four, a high-level confidential informant. The guidelines go on to detail what Justice Law

23

Enforcement Agency (JLEA) agents and employees of the Department of Justice, directly or indirectly, can and cannot do. It addresses monetary payment practices of monies that a JLEA can pay to a CI in the form of fees and rewards commensurate with the value of the information or assistance provided. Contingencies are always out of the question.

44. The Attorney General Guidelines Regarding the Use of Confidential Informants, published in September of 2005, appreciate the difference between cooperating witnesses as opposed to confidential informants. Assets are sources who assist the FBI in international terrorism, foreign intelligence, or foreign counterintelligence investigations. There appears to be no definition of confidential human sources as implicated here in the OSMAKAC case. The regulations likewise are somewhat vague as related to the payments of a CHS against a terrorism case backdrop. For purposes of inclusion and simplicity the requested material is reduced to simple terms. Anything and everything that deals with agreements for payment, payments, as well as collateral obligations by any CHS or source, is the subject of these requests. Of course supporting documents and authorizations are part and parcel of the request.

45. The opinions appear to be less informative when they come to additional information sought here but even with the restrictions and the denials by the courts as to defendants not having met their burden for submission of entrapment instructions, relief is evident. The information sought here

24

should be ordered and provided under whatever safeguards the Court deems appropriate.

### IX.  THE REQUESTED MATERIAL

46.  The Defendant requests information about any FISA event and the extent. The Defendant further requests any and all information related to surveillance prior to November 1, 2010.  The Defendant requests provision of any information derived from any source in the possession of the government related to activities, statements and events involving the Defendant prior to November 1, 2010. The fact that a "source" was involved on November 5, 2010, is suggestive of an ongoing investigation of this Defendant.  Further the Defendant requests any and all information regarding the "radicalization process" and its assessment by any informant, as in this case.

WHEREFORE the Defendant, SAMI OSMAKAC, respectfully requests this Honorable Court to enter appropriate orders herein.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on 6th  day of  March 2013,  I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF which will send a notice of electronic filing the following:   United States Attorney's Office, 400 N. Tampa Street, Room 3200, Tampa, Florida 33602.  I further certify that I mailed the foregoing document and the notice of electronic filing by first - class mail to the following non-CM/ECF participants:

_____.

LAW OFFICES OF TRAGOS & SARTES, P.L.

 /s/ George E. Tragos
GEORGE E. TRAGOS, ESQ.
601 Cleveland Street, Suite 800
Clearwater, FL 33755
(727) 441-9030
SPN 00000117
Florida Bar No. 184830
E-mail: george@greeklaw.com

26