**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


**UNITED STATES AMERICA,**

**v.**                                                    **Case No.: 8:12-cr-45-T-35-AEP**

**SAMI OSMAKAC**
_____/

**ORDER**

**THIS CAUSE** comes before the Court for consideration of Defendant's Motion in Limine (Kohlman) or in the Alternative, for a Daubert Hearing (Dkt. 228), Defendant's Addendum to that motion (Dkt. 256), and the Response in opposition thereto filed by the Government (Dkt. 237).  Upon consideration of all relevant filings, case law, the evidence and parties argument at the hearing on April 28, 2014, and being otherwise fully advised, the Court **GRANTS in part and DENIES in part** Defendant's Motion, as set forth at the hearing and now described herein.

## I.   BACKGROUND

Defendant is charged with attempted use of weapons of mass destruction in violation of 18 U.S.C. § 2332a(a)(2) and with possession of a firearm not registered to him in violation of 26 U.S.C. §§ 5861(d), 5871.  (Dkt. 10)  The Government seeks to introduce the expert testimony of Evan F. Kohlmann ("Kohlmann").  Kohlmann's proposed testimony relates to two major areas: (1) the definition and explanation of various terms, phrases, references, organizations, individuals, and publications allegedly mentioned by the Defendant during the course of the investigation or that may be otherwise linked to

him; and (2) seven factors that Kohlmann believes form a "general objective profile of a prototypical 'homegrown' terrorist."  (Dkt. 228-1 at 6)

Kohlmann's seven factors are: (1) the formulation of self-selecting schemes aimed at traveling abroad to join foreign terrorist organizations, attending training camps, and/or achieving imminent acts of physical violence; (2) the adoption of a hardline sectarian religious perspective; (3) the use of coded language and attempts at logistical subterfuge; (4) the deliberative collection and/or redistribution of terrorist propaganda; (5) the browsing of Internet websites run by or on behalf of international terrorist organizations; (6) pre-existing connections to known extremist groups and accused terrorists; and (7) the acquisition of weapons or explosives, training manuals, and/or creating makeshift training camps.  (Dkt. 228-1)

The defense seeks to exclude Kohlmann's testimony, arguing that:

1) There is no indication that Kohlmann is qualified as an expert on computer forensics and analysis, (Dkt. 228 at 3);

2) Kohlmann's proposed testimony as to the purpose of Defendant's international travel is rank speculation, (Id. at 2);

3) Kohlmann's  proposed testimony as to the backgrounds of Shaykh Omar Abdel Rahman, Shaykh Anwar al-Awalki, Shaykh Abu Hamza al-Masri, Shaykh Abdullah al-Faisal al-Jamaiki, and Yassin and Mounir Chouka, is improper and prejudicial because there is no evidence that Defendant knew the detailed background Kohlmann has proffered, (Id. at 2);

4) Kohlmann's proposed testimony as to the background of various organizations and their publications is improper and prejudicial because there is no evidence that Defendant "read the articles, heard the speeches or saw the videos or knows of the background or connection that these publications or individuals have with any groups," (Id. at 4);

5) Kohlmann improperly "speculate[s] and interpret[s] Mr. Osmakac's words, his meanings and what he was thinking when he said these words," (Id. at 2-4);

6) Kohlmann refers to a June 2011 video with no evidence Defendant "viewed the video or even knew what the video said or who was on it," (Id. at 5);

7) Kohlmann's conclusion that Defendant is a "homegrown terrorist" is "merely being presented to the jury to inflame their emotions with reference to Mr. Osmakac and to prejudice them in such a way as to shift their attention from the charges filed by the Government," thus labeling Defendant a "terrorist" is prejudicial and irrelevant to the charges pending against him, (Id. at 5-6); and

8) Kohlmann expounds from a list of URLs that Defendant knew information regarding the background of certain individuals, (Dkt. 256).

In response the Government argues that Kohlmann's testimony is otherwise proper under Fed. R. Evid. 702 and "will be highly useful to the jury to enable them to understand the references and admissions that the defendant makes in various recorded conversations,"[1] and "will also greatly assist the jury in understanding the evidence relevant to the defendant's predisposition to commit this crime, if an entrapment defense is properly asserted." (Dkt. 237 at 2-3) The Government notes that Kohlmann has been qualified as an expert in several prior federal cases. The Government also notes that many of defendant's statements "make clear that he has reviewed certain information, enabling Kohlmann to draw the conclusion that the defendant does in fact know much if not all of the background information to which Kohlmann will testify." (Dkt. 237 at 8) Finally, the Government asserts that it "will not rely on Kohlmann at trial to testify to the contents of the hard drive of a computer taken from the defendant's residence," rather, "subject matter experts from the Federal Bureau of Investigation ["FBI"] will testify to the

---

[1] For instance, the Government explains that Kohlmann will elucidate:

> [T]he defendant's references to "big hijjrah" as code for a violent attack, Dkt. 228-1 at 7; the "underwear bomber," id. at 8; the identity of prisoners the defendant sought to free, id. at 9; other elements of the defendant's martyrdom video, id. at 11; various elements of the defendant's understanding of Muslim ideology, particularly his adherence to salafi-jihad concepts, id. at 11-22; the defendant's use of operational security and covert communications, id. at 22-24; the defendant's subscription to the principles of Anwar Al-Awlaki, id. at 13-15 and 25-27; and the import of the defendant's viewings of and references to various sites containing extremist propaganda, id. at 32-36.

(Dkt. 237 at 7)

contents of the computer hard drive."  (Id. at 10-11)

On April 28, 2014, the Court held a hearing, primarily to address the Daubert issue. At the hearing, Kohlmann testified extensively regarding his qualifications, methodology, and proposed testimony, and was subject to questioning from the Court and defense.

## II.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Rule 702 compels courts to perform a "gatekeeping" function—specifically, to determine whether the proffered expert testimony is reliable and relevant.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 n. 7, (1993).  The Eleventh Circuit has highlighted the importance of the gatekeeping function; it is because expert witnesses are free to opine without firsthand knowledge, while relying upon inadmissible hearsay, that courts must carefully judge the intellectual rigor employed by the expert.  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).  In determining the admissibility of expert testimony under Federal Rule of Evidence 702, the court applies a "rigorous" three-part inquiry.  Id.  Expert testimony is admissible if (1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact through the application of scientific, technical, or

specialized expertise, to understand the evidence or to determine a fact in issue.  Id.  The Eleventh Circuit describes these three distinct concepts separately as "qualification, reliability, and helpfulness."  Id.

The "reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community."  McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004).

The burden of laying the proper foundation for the admission of expert testimony rests with the party offering the expert.  McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002).  The admissibility of the expert must be established by a preponderance of the evidence.  Id.

## III.   DISCUSSION

Kohlmann's qualifications to testify as to the "'meaning and context of various words and phrases used by the defendant which are commonly used by persons practicing extreme Islam'; the 'structure and leadership of groups adhering to the principles of Islamic extremism'; and the 'manner and means employed by extremist Islamic groups to recruit individuals and the process of radicalization which occurs within such groups,'" has been upheld by various District Courts and Circuit Courts of Appeal. United States v. Hassan, 742 F.3d 104, 130-31 (4th Cir. 2014).[2]

---

[2] See also, e.g., United States v. Subasic, 12-4683, 2014 WL 1647522, at *1 (4th Cir. April 25, 2014); United

It was established at the hearing that Kohlmann holds a degree in International Politics from the Edmund A. Walsh School of Foreign Service at Georgetown University, a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University, and a Juris Doctorate from the University of Pennsylvania Law School.  See also (Dkt. 228-1 at 1)  While in college and thereafter, he was employed at the Investigative Project where he studied and reported on the communications, recruitment, and funding of terrorist networks.  During that time he also began compiling a database of terrorism related videos, documents, and other media.  Kohlmann's database now includes seven terabytes of information. Kohlmann has personally interviewed several terrorists, and/or the families of terrorists, attending terrorist rallies, and he has also reviewed other substantial secondary and tertiary sources of terrorism related information.

Kohlmann is the author of AL-QAIDA'S JIHAD IN EUROPE: THE AFGHAN-BOSNIAN NETWORK (Berg/Oxford International Press, London, 2004), which was subject to a blind peer-review process.  Kohlmann has also published peer-reviewed articles that addressed in an individual context the significance and presence of six of the seven behaviors he has observed in terrorists' behavior.

Kohlmann concedes he has not, however, published a peer-reviewed article that addresses all seven of the characteristics, or elucidated how their interaction might predict whether an individual is, or will become, a terrorist, as he proposes to testify here.

---

States v. Kaziu, 2014 WL 961065, *4 (2d Cir. Mar. 13, 2014); United States v. Farhane, 634 F.3d 127, 158-59 (2d Cir. 2011); United States v. Benkahla, 530 F.3d 300, 309 (4th Cir. 2008); United States v. Sabir, S4 05 CR. 673 (LAP), 2007 WL 1373184, at *3-4, *10-11 (S.D.N.Y. May 10, 2007); United States v. Paracha, 69 Fed. R. Evid. Serv. 130 (S.D.N.Y. 2006) aff'd, 313 Fed. Appx. 347 (2d Cir. 2008).

Likewise, Kohlmann testified that his work is not amenable to a known error rate or control group testing, or to statistical analysis generally, because, among other things, the pool of terrorists is so statistically small that one or two aberrant results would skew the statistical analysis.  Thus, rather than offer what he describes as a "Fisherian analysis,"[3] he performs a "Bayesian analysis,"[4] comprised of a comparative-analysis involving the gathering of multiple sources of information, including original, secondary and tertiary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain consistent with the most reliable sources.

Given what he concedes is an approach that is not amenable to statistical verification and, thus, the lack of secondary verification, Kohlmann could not testify to any precise confidence level he would ascribe to the likelihood of a person being a terrorist as the number of factors present increases, only that his confidence in his own conclusions escalates as the number of factors present rises.  He did testify that a minimum of four to five factors is typically necessary to give him confidence necessary to

---

[3] R.A. Fisher was an English statistician and geneticist who is generally credited with establishing the 0.05 level of statistical significance.  David H. Kaye, Rounding Up the Usual Suspects: A Legal and Logical Analysis of DNA Trawling Cases, 87 N.C.L. Rev. 425, 455 n.158 (2009).  Fisher is a father of "Frequentist" analysis, which draws conclusions from sample data by emphasizing the frequency or proportion of the data.  For example a Frequentist would hold that "[w]hen a fair coin is tossed, the probability of heads is 1/2; if the experience is repeated a large number of times, the coin will land heads about one-half the time. . . . Generally, if a chance experiment can be repeated, the relative frequency of an event approaches (in the long run) its probability."  FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 273 (3d ed. 2011).

[4] Bayes' theorem "is a formula that relates certain conditional probabilities. It can be used to describe the impact of new data on the probability that a hypothesis is true."  FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 200 (3d ed. 2011).  "In its simplest form, [Bayes' rule is] an equation involving conditional probabilities that relates a 'prior probability' known or estimated before collecting certain data to a 'posterior probability' that reflects the impact of the data on the prior probability.  In Bayesian statistical inference, 'the prior' expresses degrees of belief about various hypotheses. Data are collected according to some statistical model; at least, the model represents the investigator's beliefs.  Bayes' rule combines the prior with the data to yield the posterior probability, which expresses the investigator's beliefs about the parameters, given the data."  Id. at 283.

express a conclusion.   Kohlmann also testified that he did not believe the seven factors are exhaustive, or that the presence or absence of any given factor in a certain case is dispositive.  Moreover, he could not identify other factors he might consider noteworthy as this time.

Against this proffer and associated voir dire, the Court finds that Kohlmann is qualified to testify as to the definition and explanation of various terms, phrases, and references, specifically, the terms hijrah, big hijrah, kufar, takfiri, and jihaad; as well as the import of black flags.[5]  He is also qualified to testify concerning certain organizations, individuals, and publications mentioned by, or that the Government may, through other competent evidence, link to, the Defendant provided that those organizations, individuals, and publications are disclosed in Kohlmann's expert reports.  Even then, the opinions may only be expressed if an adequate foundation for these topics is laid by the Government at trial.

Kohlmann may not testify as to his denominated "homegrown terrorist" factors. The Court finds that the proposed testimony – the confluence of some combination, in unspecified quantities, of the seven factors and their predictive value in assessing whether someone is, or is likely to become, a homegrown terrorist – has not been subjected to peer review, it does not have a known error rate, it has not been tested and it does not appear from this record that the factors are capable of being accurately tested,

---

[5] At the hearing the Court initially ruled that Kohlmann could not testify as to the import of "black flags" based upon the Government's representation that such testimony had not been included in the expert report.  Upon further review, it appears such testimony is contained in the report and thus will be admissible upon a proper foundation.  See (Dkt. 228-1 at 11) ("Osmakac told the UCE, 'Insha' Allah [God willing], there will be video ... You have la ilahillallah [No god but God] flags right, the black with the white letters? You do?'  Here, the defendant is seeking to acquire a 'shahada' or 'al-Raya' Islamic banner, which is closely associated with contemporary Islamist political movements and is used regularly as a background in jihadist 'martyrdom' videos.")

nor is there evidence before the Court concerning its general acceptance or use amongst other experts in this field, or even who the other experts in Kohlmann's field might be. Even Kohlmann cannot describe, to any acceptable degree of certainty, the point at which his confidence level transforms the presence of these factors from purely subjective supposition to a reasonably reliable expert opinion.

Additionally, the use of the factors as predictive tools or reference to them as denominated by Kohlmann presents a substantial risk of jury prejudice in this case, which prejudice would substantially outweigh the probative value of the testimony even if it were admissible. Fed. R. Evid. 403. In addition to the factors bordering on profiling and stereotyping, they may give the jury a false confidence that there exists some talismanic tool or mechanical formula that can be employed to determine whether someone is a "homegrown terrorist" and thus necessarily guilty of the crime or possessed of the requisite motive to commit the crime alleged here. Such an invitation suggests the use of propensity, which is expressly proscribed by the Rules of Evidence. Additionally, Kohlmann could cite only two instances (out of how many is unknown) in which he was able to accurately predict, prior to any actual terrorism-related conduct, that certain individuals were "homegrown terrorists." And, he candidly admitted that the presence of several of the factors in a given individual does not necessarily mean the person is, or is likely to become, a "homegrown terrorist."

Thus, the proposed testimony does not met the requisite level of reliability for admission in this matter. While these factors may be suitable as an investigative tool, subject to appropriate protections against civil rights violations, they are difficult to employ in a court of law while simultaneously giving due regard for the evidence and the rights of

the presumptively innocent to have the case tried by a jury of his peers.

Likewise, the Court declines to take the track of the court in United States v. Mohamud, 3:10-CR-00475-KI, 2013 WL 71806 (D. Or. Jan. 4, 2013) ("Daubert Order"), because this Court concludes that the testimony, qualified so significantly, would be of a little, if any, assistance to the jury.  In Mohamud, in its Daubert Order, the Oregon court acknowledged that Mr. Kohlmann's latest publications have not been in peer-reviewed journals, had no known error rate and were not derived from an evaluation of a formal control group study.  Id. at *6.  Nevertheless, the court ultimately concluded that these "are issues that can be explored in cross examination."  Id.   Further, because the court was "concerned" about "an expert labeling defendant as a homegrown terrorist" as "code words for predisposition," the court held that "[t]he experts may explain the factors and indicators derived from their research; may explain whether people demonstrating these factors and indicators are violent or not, in the experts' experience; and may explain how well defendant fit the factors and indicators.  But the experts may not testify on the ultimate label they would affix to defendant."  Id.

This Court finds that such an approach – allowing Kohlmann to proceed all the way up to the predictive line without crossing it – would only encourage the jury to speculate, and the probative value of such evidence would be substantially outweighed by the danger of unfair prejudice.   A limiting instruction in these circumstances will not likely be sufficient because, as noted, these are not matters that would commonly be understood in lay vernacular, such that such a limitation would beg the question, "What are we to do with the testimony?".

Kohlmann may, however, testify as to conduct of the Defendant that happens to

meet his factors and is linked to teachings from the various clerics or organizations the Defendant is linked to, or instructions found in the media Defendant is shown to have consumed.  For example, the Government proffered that certain of Defendant's actions in attempting to avoid surveillance and to obfuscate his online activity (Kohlmann's third factor) were at the instruction of al Qaeda via Inspire magazine.  Kohlmann may testify as to this essentially factual issue or those similar to it.  In other words, to the extent Defendant's conduct in this case aligns with instructions or teachings from extremist clerics or publications, Kohlmann may testify to that connection, even where the connection comports with one of his own factors, and, if the Government so desires, Kohlmann may testify to that connection using his own phraseology, such as "the use of coded language and attempts at logistical subterfuge," as something that is taught by certain clerics or subversive media sources.  What he may not do is characterize these behaviors as factors, or indicators, or predictors of behavior.  Nor may Kohlmann employ the term "homegrown terrorist" or testify as to some limited universe of characteristics, the presence or absence of which is predictive of this Defendant being a "homegrown terrorist."

Pursuant to the Government's representations at the hearing, whether or not Kohlmann possesses expertise in the area of computer forensics, it is not offering Kohlmann as an expert in computer forensics and analysis, but rather will rely on the testimony of FBI subject matter experts on that topic.  Accordingly, Kohlmann will not be permitted to testify on that subject, nor will he be permitted to opine as to the absence or alleged purging of certain information from the Defendant's computer.  Such expert testimony, if presented, shall come from the Government's computer forensics and

analysis expert(s).    If those experts do lay a proper foundation regarding material that has been deleted from Defendant's computer, Kohlmann may testify, on the assumption of the truth of the forensic expert's opinion, that the Defendant's conduct is in keeping with the teachings of certain terrorist sects, which the Government establishes can be linked to the Defendant.

## IV.    CONCLUSION

Upon consideration of the foregoing it is **ORDERED** as follows:

1. Defendant's Motion in Limine (Kohlman) or in the Alternative, for a Daubert Hearing (Dkt. 228) is **GRANTED in part and DENIED in part**.

2. As also discussed at the Hearing, the Government shall have up to and including **May 19, 2014** to provide its expert reports concerning the Defendant's competence and mental capacity to Defendant.

**DONE** and **ORDERED** in Tampa, Florida, this 19th day of May, 2014.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to**:
All Counsel of Record
All *Pro Se* parties